**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.J.C., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., MOTHER | : : : : : : : | |
| | : | No. 1742 MDA 2023 |

Appeal from the Decree Entered November 20, 2023
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9261

| | | |
|---|---|---|
| IN THE INTEREST OF: J.N.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., MOTHER | : : : : : : | |
| | : | No. 1743 MDA 2023 |

Appeal from the Decree Entered November 20, 2023
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9262

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: MAY 15, 2024**

A.C. (Mother) appeals[1] from the decrees, entered in the Court of Common Pleas of Luzerne County, Orphans' Court Division, involuntarily terminating her parental rights to her children, K.J.C. (born 10/2018) and

---

[1] On January 12, 2024, our Court *sua sponte* consolidated the above-captioned appeals. *See* Pa.R.A.P. 513.

J.N.B. (born 3/2020) (collectively, Children), pursuant to 23 Pa.C.S.A. §§ 2511(a)(8) and (b).[2]  After careful review, we are constrained to reverse.

On July 1, 2019, police conducted a "drug bust" at a Hazelton residence where Mother was staying for the weekend.  The "bust" involved alleged gang activity, drug sales, and "constant fighting."  Mother was arrested and ultimately pled guilty to two counts of manufacturing, delivering, and possession with intent to deliver a controlled substance and one count of endangering the welfare of children.[3]

On July 10, 2019, K.J.C. was declared dependent and placed in the emergency custody of Luzerne County Children and Youth Services (CYS). The court set the permanency goal as reunification and ordered the following family service plan for Mother:  "[(1)] obtain and maintain stable and safe housing;  [(2)]  participate  [in  and  successfully  complete]  parenting [education];  [(3)  participate  in]  a  mental  health  evaluation  and  follow recommendations;  [(4)  engage  in]  drug  and  alcohol  evaluation  and  follow

---

[2] The parental rights of Children's birth fathers (Fathers) were also terminated. However, Fathers are not involved in this consolidated appeal.

[3] Mother testified that her oldest child, who was two years old at the time, was staying with her at the house when she was arrested.  **See** N.T. Termination Hearing, 3/15/23, at 55.  That child is not a subject of the instant matter.  **Id.**

recommendations; and [(5)] participate in drug testing."[4]  *See* N.T. Termination Hearing, 3/15/23, at 23.

J.N.B was born in March 2020, while Mother was incarcerated. Two days following her birth, J.N.B was placed in CYS' custody pursuant to an emergency shelter care order. J.N.B was declared dependent in April 2020. Mother had not yet completed her family service plan for K.J.C.'s matter, and charges were still pending against her for the July 2019 criminal episode. The same service plan that was ordered in K.J.C.'s matter was established for Mother in J.N.B.'s case. Children were placed in the same foster home,[5] a pre-adoptive resource, where they continue to reside.

Mother was incarcerated, on the July 2019 charges, from July 2020 until December 23, 2020, when she was released on probation.[6]  In March 2021,

_____

[4] Some of Mother's drug testing involved the "color call-in" system, a process by which "an individual telephones in daily to determine if their assigned 'color' requires them to submit to a toxicology test on any given day." *See* Appellee's Brief, at 7.

[5] K.J.C. was placed with foster parents on February 14, 2020, and J.N.B. was placed in the same foster home when she was discharged from the hospital two days after her birth in March 2020.

[6] Mother did not have a valid driver's license and did not own a car upon her release from prison. *See* N.T. Termination Hearing, 3/15/23, at 42. Mother also did not have a license or car at the time of the termination hearings. *Id.* at 43.

Karen Mazdaccaro was appointed as a Court Appointed Special Advocate (CASA)[7] to represent Children's best interests.

On January 19, 2022, CYS filed petitions to terminate Mother's rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (8), and (b). On January 21, 2022, the court appointed Tiffany Crispell, Esquire, as Children's guardian *ad litem* and attorney to represent their best and legal interests at the termination hearings. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings); *see also In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

_____

[7] A CASA is:

> a trained community volunteer, appointed by a judge, to represent the best interests of an abused and neglected child (or sibling group) in court. Volunteer advocates independently assess each child's situation and dedicate themselves to learning all they can about a child's unique history and experiences. They then make informed recommendations to the Luzerne County Dependency Judges as to: 1) what permanent placement would be best for that particular child, and 2) what immediate services the child needs, whether it be educational, social, mental health, physical health, or cultural.

*See* https://luzernecasa.org/about (last visited 5/6/24).

On November 2, 2022, the court held a permanency hearing[8] at which Bradley Petras, the Director of Services at Catholic Social Services (CSS), testified. Petras, who also serves as the supervisor of the Visiting Coaches Program at CSS, testified that he received a referral from CYS to take Mother's case; he was Mother's visit coach from May 13, 2021, through December 11, 2021.[9] In his position, Petras reviewed coaches' visit session notes and supervised the coaching staff. *See* N.T. Permanency Review Hearing, 11/2/22, at 28. Petras testified that Mother's visits were scheduled weekly on Saturdays. *Id.* at 16. From May 2021 through July 2022, Mr. Petras testified that Mother attended 15 sessions, had four "no shows," and failed to confirm 22 visits. *Id.* at 16.[10] Petras testified that Mother came to the visits he supervised "very unprepared," with no planned activities for Children. *Id.* at

---

[8] Although the court's transcript of proceedings held on November 2, 2022, designates the proceeding as a "Termination of Parental Rights Proceeding," in fact, the court and parties deemed it a permanency hearing. *See* N.T. Hearing, 11/2/22, at 40 ("So we're solely addressing the permanency today? That's right.").

[9] In December, Yulissa Arias took over as Mother's visit coach, until Arias left the agency in July 2022. Then, Melissa Boub became Mother's visit coach in July 2022.

[10] Due to Mother failing to appear for three sessions, she was required to confirm her visits with Petras' office or CYS via text or telephone call. *Id.* at 16. Mr. Petras testified that Mother did not provide confirmation for twenty-two visits, and, therefore, these visits were cancelled. *Id.* There were four other visits which Mother confirmed, but did not appear for the visits, which were then categorized as "no shows." *Id.*

16-17. Petras described the visits as "just more along the lines of [C]hildren running around and [Mother] trying to just ask them, you know, what color is this, what color is that, is this a truck. There was not a lot of interaction." *Id.* at 17. Finally, Petras testified that CYS's referral indicated that Mother had completed a parenting course at Justice Works. *Id.* at 23.

Mother was served notice of the termination petitions, via affidavit, on March 5, 2022.[11] On March 15, 2023 and March 30, 2023,[12] the court held termination hearings. "Grounds" witnesses consisted of CYS caseworker Cindy Jones, Justice Works Youth Care (JWYC) Director Vincent Troutman, Mother's transporter and JWYC visit supervisor Lori Thomas, and Mother. "Best Interest" witnesses consisted of CASA Madzaccaro and JWYC Case Aide Kristen Paisley.

At the conclusion of CYS' case-in-chief, Mother's attorney moved for a directed verdict arguing that because Mother had completed all of the services, CYS did not prove its burden that termination would serve the needs and best interests of Children at that time. *See* N.T. Termination Hearing, 3/15/23, at 37. The court denied the motion. *Id.* at 38 (court indicating while

_____

[11] The affidavit of service was recorded by the Luzerne County Judicial Services & Records Department on March 11, 2022.

[12] Mother was on probation at the time of the hearings, with an anticipated end date of May 2023. *See* N.T. Permanency Hearing, 11/2/22, at 32. With regard to probation conditions, Ms. Jones testified that Mother was compliant with drug and alcohol treatment and needed to complete community service. *See id.* at 36.

it denied motion because "at least at this juncture, . . . [there is the] potential that [CYS'] grounds [have been met]," Mother could rebut that by her upcoming case-in-chief). On November 20, 2023, the trial court entered decrees involuntarily terminating Mother's parental rights to Children pursuant to subsections 2511(a)(8) and (b) of the Adoption Act. *See* 23 Pa.C.S.A. §§ 2101-2938. The court also changed the goals to adoption (primary), with a concurrent goal of subsidized permanent legal custodianship (SPLC).

Mother filed timely notices of appeal and contemporaneous Rule 1925(b) concise statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2). On appeal, Mother presents the following issues for our consideration:

(1) Did the trial court abuse its discretion, commit an error of law, and/or [] was [there] insufficient evidentiary support in terminating the parental rights of [M]other as the grounds pursuant to [subsection] 2511(a)(8) were not established by clear and convincing evidence, and such granting of a petition to terminate parental rights was against the weight of the evidence presented by the parties[?]

(2) Did the trial court abuse[] its discretion, commit[] an error of law, and/or [] was [there] insufficient evidentiary support for the court's decision that the best needs and welfare of [C]hildren would be served by terminating [M]other's parental rights as required by [subsection] 2511(b)[?]

Mother's Brief, at 3.

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When

applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 587.

If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, then the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Pursuant to subsection 2511(a)(8), the subsection under which the trial court terminated Mother's rights, parental rights may be terminated after a petition is filed on the following ground:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8). Moreover, under subsection 2511(b):

> **Other considerations.** — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), **the court shall not consider any efforts by the parent to remedy the conditions described therein <u>which are first initiated</u> subsequent to the giving of notice of the filing of the petition.**

*Id.* at § 2511(b) (emphasis added).

To satisfy subsection 2511(a)(8), CYS must prove that: (1) Children have been removed from Mother's care for at least 12 months; (2) the conditions which led to Children's removal or placement still exist; and (3) that termination of Mother's parental rights would best serve Children's needs and welfare. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). The relevant inquiry for a section 2511(a)(8) analysis is whether the "conditions" at issue have been "remedied . . . [such that] reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (citation omitted).

This Court has acknowledged:

[T]he application of [subs]ection (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

*Id.* at 11-12 (emphasis in original) (citations omitted). Finally, in ***In re M.E.***, 283 A.3d 820 (Pa. Super. 2022), our Court reiterated that "the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "'any efforts by the parent to remedy the conditions described [in the petition] which **are first initiated subsequent to the giving of notice** of the filing of the petition.'" *Id.* at 832 (emphasis added), citing 23 Pa.C.S.A. § 2511(b).

Here, with regard to the second prong[13] of subsection 2511(a)(8), the trial court found that "[p]arenting education, *i.e.*, lack of bonding between Mother and [C]hildren, inability to find adequate housing for [C]hildren, and Mother's lack of consistency with the color call[-]in system for substance abuse, were still not completed as of January 19, 2022"—**the date when CYS filed the termination petitions**." Trial Court Opinion, 1/31/24, at 9 (emphasis added). *See id.* at 18 ("Therefore, this court finds that the condition[s] of Mother 1) not clearly remedying her substance abuse issues; 2) not completing the [Intensive Family Reunification Service (IFRS)] services to address bonding; and 3) not obtaining safe and stable housing, were still in existence as of the time of filing of the petition to terminate Mother's parental rights on January 19, 2022.").

---

[13] There is no dispute that Children have been removed from Mother's custody for at least 12 months, as is required under the first prong of subsection 2511(a)(8).

Further, the trial court made the following findings of fact and conclusions of law with regard to terminating Mother's parental rights under subsection 2511(a):

- CYS showed by clear and convincing evidence that Mother's rights to Children should be involuntarily terminated under subsection 2511(a)(8);

- Under subsection 2511(b), "Other Considerations," when a petition is filed pursuant to subsection 2511(a)(8), "the court shall not consider any effort by the parent to remedy the condition **subsequent to the filing of the petition** to terminate the parent's parental rights";

- Mother did not have stable housing until June 2022, "**subsequent to the filing of the petition** to terminate her parental rights;"

- Mother began consistently visiting Children between March 15, 2022 and March 15, 2023—"**all subsequent to the filing of the petition** to terminate Mother's parental rights on January 19, 2022;"

- Mother never consistently participated in the "color call-in" system for toxicology screenings;

- Mother refused to participate in a "recommended" [IFRS] program after successfully completing a parenting education program between December 29, 2020, and March 31, 2021;

- "[**A**]**s of the filing date of the petition**" to terminate Mother's parental rights on January 19, 2022, Mother still needed to complete her parenting education through the IFRS program;

- Mother testified that she obtained housing in June of 2022.

- "[A]ny effort by Mother to obtain housing **subsequent to the [January 19, 2022] filing of the petition** to terminate her parental rights was not considered by the [c]ourt";

- "Although Ms. Jones confirmed that all of Mother's services had been completed as of March 15, 2023, the [c]ourt

- 11 -

recognizes, however, that not all of Mother's services were completed **as of the filing date of the petition** to terminate Mother's parental rights on January 19, 2022";

- Parenting education, i.e., lack of bonding between Mother and Children, inability to find adequate housing for Children, and Mother's lack of consistency with the color call-in system for substance abuse, "**were still not completed as of January 19, 2022"**;

- The court did not consider any notes from visitation supervisor and CYS Caseworker Yulissa Arial that were dated **after the filing of the petition to terminate**;

- The court did not consider any testimony from Kristen Paisley, a JWYC worker, because her testimony "covered the period **subsequent to the filing of the petition** to terminate Mother's parental rights on January 19, 2022"; and

- Mother's refusal to participate in the IFRS program, Mother's lack of participation in the color call-in system pertaining to her substance abuse/sobriety and need for safe and stable housing were not remedied by Mother "**as of the filing date of the petition** to terminate Mother's parental rights on January 19, 2022."

Trial Court Opinion, 1/31/24, at 4-18 (emphasis added).

As is evident from the above-quoted sections of the trial court's opinion, the trial court was under the impression that, statutorily, it was not permitted to consider any efforts that Mother made to remedy conditions listed in CYS' petitions after CYS filed the termination petitions. This conclusion is a legal error, **In re L.A.K.**, **supra**, as subsection 2511(b) plainly states that, when evaluating termination under subsection 2511(a)(8), a trial court is not to consider any efforts made by a parent to remedy the conditions described in the agency's petition "**which are first initiated subsequent to the giving of notice of filing of the petition**." 23 Pa.C.S.A. § 2511(b) (emphasis

added). Thus, in light of this legal error, we must determine whether there was clear and convincing evidence to support termination based upon any efforts that Mother initiated before March 5, 2022 (the date she received notice of the filings of the termination petitions) to remedy the conditions that led to Children's placement.

First, with regard to securing stable housing, Mother ultimately obtained a three-bedroom house in June of 2022 that was deemed suitable for Children. *Id.* at 38-39. Prior to that, Mother lived with her sister in McAdoo from August 2021 through February 2022. *See* N.T. Termination Hearing, 3/15/23, at 18. Then, Mother moved into the Red Rooster Hotel. *Id.* CYS Caseworker Jones testified that, despite the fact that Mother was not able to obtain adequate housing until June 2022, "she's been attempting to find adequate housing **throughout the life of the case**." *Id.* at 30 (emphasis added); *id.* at 31 (Caseworker Jones testifying Mother has been trying to obtain suitable housing **since 2019**).[14]

_____

[14] Moreover, it is well-established that a court may not terminate parental rights based solely upon environmental factors, such as inadequate housing, that are beyond the parent's control. *See* 23 Pa.C.S.A. § 2511(b). Here, Mother testified that she was denied housing multiple times based upon her criminal history and that she was reluctant to seek housing through IFRS because it would not permit her to obtain housing due to her criminal background. Even though Mother's own actions were the cause of her incarceration, the fact that she was unable to obtain housing because of a criminal record is, effectively, an environmental factor beyond her control, upon which a termination decree cannot solely be based.

Thus, because the record supports the fact that Mother "first initiated" efforts to obtain suitable housing in 2019—well before she received notice of CYS' termination petitions— and then continued these efforts throughout the life of the case, it was error for the trial court to base its ruling to terminate Mother's parental rights under subsection 2511(a)(8) upon this condition. *See* 23 Pa.C.S.A. § 2511(b).[15]

Second, the trial court additionally justified its termination of Mother's parental rights for her failure to remedy her substance abuse issues. However, case law is clear that terminating a parent's parental rights under subsection 2511(a)(8) does **not** require an evaluation of a parent's willingness or ability to remedy the conditions that led to Children's removal or placement. *See In re Adoption of M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, the relevant inquiry is focused upon whether the "conditions" at issue

---

[15] Instantly, Mother testified that upon her release from prison, she was evicted from her home in January 2021. *See* N.T. Termination Hearing, 3/15/23, at 42. Mother testified that she applied for public housing, but her application was denied because of her criminal record. She also testified that she went through "CEO" for housing but was unsuccessful because they were not providing funding at the time. *Id.* at 44. Although not clarified, we suspect that CEO stands for the Commission on Economic Opportunity, a Luzerne County organization that provides comprehensive housing counseling and assistance to county residents, including families with children. *See* https://www.ceopeoplehelpingpeople.org/housing_and_energy (last visited 5/6/24). Moreover, Mother testified that she looked for an apartment in the Hazelton area but had trouble securing money for a security deposit because she "was working only certain days." N.T. Termination Hearing, 3/15/23, at 45.

have been "remedied . . . [such that] reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d at 11.

Instantly, the facts show that Mother completed a drug and alcohol evaluation, as per her service goals, in April 2020, and the provider indicated that no further services were required. Moreover, CYS caseworker Jones specifically testified at the permanency and termination hearings that not only was there no need for Mother to have any drug and alcohol treatment referrals, but that CYS "**had no concerns at this time of [Mother's] drug use**." N.T. Permanency Hearing, 11/2/22, at 37 (emphasis added); N.T. Termination Hearing, 3/15/23, at 27, 34. While Mother has never tested positive for any substance (random testing) throughout the life of the case, *id.*, 3/30/23, at 34-35, she was not consistent using the color call-in system. *Id.*, 3/15/23, at 27. However, because CYS specifically indicated that it had no concerns regarding Mother having a substance abuse problem, we conclude that it was improper for the court to base its decision to terminate on this factor.

The final reason supporting the court's decision to terminate Mother's parental rights under subsection 2511(a)(8) was her failure to "complet[e] the IFRS services to address bonding." Trial Court Opinion, 1/31/24, at 18. Notably, under Mother's original service plan goals, she was only required to complete parenting education; the goal did not state that she was to follow any recommendations. *See* N.T. Termination Hearing, 3/15/23, at 23 (CYS caseworker Jones testifying Mother's court-ordered services required her, in

part, "to participate in parenting, to cooperate with a mental health evaluation **and follow recommendations**, and to participate with a drug and alcohol evaluation **and follow recommendations**") (emphasis added); *id.* at 28 (Ms. Jones testifying CYS' required services included Mother to "complete parenting education").  Moreover, CYS caseworker Jones testified that CYS did not make any referral for additional parenting services after Mother completed her parenting education.  *Id.*, 3/30/23, at 35.

To fulfill Mother's parenting service plan objective, Director Troutman[16] testified that Mother was first referred to Justice Works in February 2020 for a family and educational support program (FESP), but was discharged from the program in July 2020 when she was incarcerated.  *See* N.T. Termination Hearing, 3/15/23, at 12; *id.* at 15 (Justice Works' parenting services not offered for incarcerated parents; impossible for Mother to continue FESP in jail); *id.*, 3/30/23, at 12-13 (JWYC supervisor Kristin Paisley testifying Mother not discharged from Justice Works due to defect in parenting).  Then, in December 2020, when Mother was released from prison, she was re-referred to Justice Works for parenting education, which she completed on March 31,

---

[16] Although Director Troutman was called to the stand at Mother's November 2022 permanency hearing, the court noted that "in light of the issue with documentation, [it had to] dismiss [him and] potentially recall him[.]"  N.T. Permanency Hearing, 11/2/22, at 13.  Director Troutman was recalled at the March 15, 2023 termination hearing where JWYC records dates were entered into evidence and were the focus of counsel's examination of Director Troutman.  N.T. Termination Hearing, 3/15/23, at 10-11.

2021. *Id.* at 12. The parenting program consisted of 10 lessons on various subjects. *Id.* at 16. *See also id.* at 19 (Mr. Troutman testifying Mother's completion of JWYC's initial parenting program constituted "parenting education"); *id.* at 33 (CYS caseworker Jones testifying Mother successfully completed parenting education program in March 2021). *See* Mother's Exhibit 1 (Mother's certificate of completion for parenting program). CYS caseworker Jones testified that she did not make any referral for additional parenting services for Mother, but that she did have a concern about the parent-child bond and Mother's ability to parent Children. *See* N.T. Termination Hearing, 3/30/23, at 35.

Mr. Troutman testified that, in August 2021, Mother was "referred to the [IFRS] . . . for drug and alcohol and mental health." *Id.* at 13. Mr. Troutman described IFRS as a program through which Justice Works would "aid mom and/or dad . . . in trying to **succeed at their goals or objectives listed in the family service plan**, which could include mental health, drug and alcohol, housing." *Id.* (emphasis added). Mr. Troutman also testified that upon Mother's successful completion of the JWYC parenting program in March 2021, Mother was referred to IFRS "based on issues[—specifically, the bond with Children and housing—]that were identified in the parenting education program." *Id.* at 20; *see also id.* at 17 (Mr. Troutman testifying referral for Mother to participate in IFRS "due to the fact that during her parenting education, she may have scored lower or higher on certain assessments that we use. So maybe, I will say that [Mother] could have bonded better with her

- 17 -

Children."); *id.* at 33 (CYS caseworker Jones testifying concerns leading to IFRS referral dealt with "bond with [Mother] and the children . . . and [h]ousing"). Mother was discharged in February 2022 from IFRS, however, because "she only wanted to utilize [the] service for the transportation to and from her visits [and] participate in supervised visits or visit coaching." *Id.* at 13-14, 21.[17]

In its Rule 1925(a) opinion, the court made the following findings with respect to subsection 2511(a)(8)—in particular, the "conditions that continue to exist" and Mother's failure to participate in the IFRS program:

> It is clear from the testimony of witnesses and evidence presented that Mother has been unable to resolve her issues related to parenting education . . . and that the conditions which gave rise to the placement of [Children] continue to exist **as of the time of filing the petition to terminate Mother's parental rights on January 19, 2022**.[18]
>
> Ms. Jones stated that Mother successfully completed a parenting education program between December 29[,] 2020 and March 31, 2021. However, **as part of the parenting education program, Mother was recommended to continue with the [IFRS] program in order to improve the bond between herself and [C]hildren.**

---

[17] As to Justice Work's concern as to Mother's bonding issues with Children, Mother testified that a combination of incarceration and COVID required her to have video visits for more than one year. *Id.* at 59. Mother testified in-person visits resumed in March 2022.

[18] Again, the court incorrectly applies subsection 2511(b)'s language that "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

   \*   \*   \*

Although Ms. Jones confirmed that all of Mother's services had been completed as of March 15, 2023, **the [c]ourt recognizes, however, that not all of Mother's services were complete as of the filing date of the petition to terminate Mother's parental rights on January 19, 2022**. [N.T. Termination Hearing, 3/15/23,] at 36. **Parenting education, i.e., lack of bonding between Mother and [C]hildren . . . w[as] still not completed as of January 19, 2022.**

   \*   \*   \*

[] Mother was **recommended** to continue in the IFRS program due to the lack of bonding that she has with [C]hildren. According to Ms. Jones, due to the length of time that the children have spent with the foster family, a deep bond has developed between the foster parents and the children. *Id.*[, at] 36.

[] Mr. Troutman testified that [JWYC] received a referral from [CYS] in February 2020 regarding Mother's participation in Family, Education and Support Program [FESP]. According to Mr. Troutman, Mother did not successfully complete [FESP] due to her incarceration. Thus, Mother was unsuccessfully discharged on July 22, 2020**. In December 2020, Mother was referred to a parenting education program which she completed on March 31, 2021.** [] *Id.* at 8, 12, 16.

**Following Mother's completion of the parenting education program, Mother was then referred to the [IFRS] program in August 2021 to assist Mother in the goals listed in the Family Service Plan**[,] **such as mental health treatment, substance abuse treatment, and obtaining adequate housing.** Mr. Troutman explained that there were identified issues throughout the parenting education program. *Id.* at 20. **Mother was, therefore, referred to IFRS for various reasons, such as Mother scoring lower on certain assessments including bonding with [C]hildren**[,] **which needed improvement.**

**Therefore, even though Mother completed the parenting education, it was crucial for Mother to apply the skills that she learned through IFRS.** [] Mother would have been observed with [C]hildren at different locations such as restaurants, her residence, her sister's residence, or at an office

base[d] in Hazleton, which was utilized for conducting sessions. *Id.* at 17.

Mr. Troutman indicated, however, that Mother would not participate in the IFRS program. Thus, Mother was discharged on February 12, 2022. Mother only wished to engage in the supervised visits or visit coaching and use the services for transportation to and from her visits. *Id.* at 14. **The [c]ourt notes that as of the filing date of the petition to terminate Mother's parental rights on January 9, 2022, Mother still needed to complete her parenting education through the IFRS program.**

Mother [] admitted upon cross examination that she refused to participate in the IFRS [program] which would have given her the opportunity to apply for governmentally, subsidized housing. However, Mother claimed that she would have been denied housing due to her felony charges. Mother further admitted that she related to [CYS] that she only wished to visit with [C]hildren and did not seek IFRS help with any other matters. *Id.* at 58, 63.

\* \* \*

In *In re Z.P.*, 994 A.2d 1108 [] (Pa. Super. 2010), the Superior Court (citing *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004)[]) stated the following:

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his . . . ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. **Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.**

[*Id.* at 1119.] **The court notes Mother's <u>required participation and completion</u> of the IFRS program might have helped mother maintain a relationship with [C]hildren.** However, Mother refused to participate in the IFRS program. **The court finds in this case that [M]other did not use all the available resources to preserve her relationship**

- 20 -

**with** [**C**]**hildren.** Mother only believed that the IFRS program would not help her obtain housing due to her felony conviction and **refused to recognize that the IFRS program is an extension of the parenting program which addressed other areas other than housing, such as lack of bonding with** [**C**]**hildren.** Mother concluded on her own that she cannot obtain housing through the IFRS program simply because she would not qualify for government housing.

Trial Court Opinion, 1/31/24, at 6, 9-15 (emphasis added).

Here, the record bears out that: (1) Mother's family service plan required her to participate in parenting education with no concomitant duty to follow any recommendations from that service; (2) Mother engaged in and successfully completed a parenting education program on March 31, 2021 (just under one year *before* CYS filed its termination petition); and (3) CYS did not refer Mother for any additional parenting programs. In fact, CYS caseworker Jones specifically testified that Mother "successfully completed [a] parenting education program." N.T. Termination Hearing, 3/15/23, at 33.

Based upon these facts, we conclude that the court erred in terminating Mother's parental rights for her failure to complete a bonding course that was never a part of her family service plan or a requirement for successful completion of her parenting education. *See id.* at 13 (Mr. Troutman testifying August 2021 referral to IFRS was for Mother to focus on drug and alcohol and mental health issues); *but see id.* at 33 (CYS caseworker Jones testifying IFRS referral made to address "bond with Mother and [C]hildren . . . [a]nd housing"). Accordingly, the "testimony [was not] so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction,

- 21 -

without hesitance, of the truth of the precise facts in issue" to conclude that Mother's "condition [of completing parenting education] continue[s] to exist." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009); 23 Pa.C.S.A. § 2511(a)(8).

Under such facts, we conclude that CYS failed to prove, by clear and convincing evidence, that the conditions which led to Children's removal continue to exist. Accordingly, we find that the Orphans' Court improperly terminated Mother's parental rights under subsection 2511(a)(8).[19]

Decrees reversed. Jurisdiction relinquished.[20]

_____

[19] Having determined that the court improperly terminated Mother's rights under subsection 2511(a)(8), we need not address whether termination was proper under subsection 2511(b). *See In re R.R.D.*, 300 A.3d 1077, 1082 n.4 (Pa. Super. 2023). Moreover, neither party raises whether termination was proper under subsection 2511(a)(2) and it would be improper for this court to conduct a review of such a claim where the trial court terminated Mother's right solely upon the basis of subsections 2511(a)(8) and (b).

[20] We recognize that section 2511(a)(8) also includes a final prong—that the petitioner prove "termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(8). Instantly, J.N.B. has been with foster parents since she was two days old, and K.J.C. has lived with the foster family since February 14, 2020, when he was just over one year old. Caseworker Jones testified that she observes Children in foster parents' home on a monthly basis and noted that they are "assimilated into the family" and that that the foster parents are meeting Children's physical, developmental, and emotional needs. N.T. Termination Hearing, 3/15/23, at 81. Moreover, caseworker Jones testified that the foster parents and Children have a "parent-child bond," that Children call them "mommy and daddy," and that Children would not suffer any detrimental effects if Mother's parental rights were terminated. *Id.* Conversely, caseworker Jones testified that while Children are "familiar with their mother," it is not a parent-child type of bond. *Id.* at 82.
*(Footnote Continued Next Page)*

Judgment Entered.

*[signature: Benjamin D. Kohler]*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/15/2024

_____

Despite the fact that Mother has made significant strides in completing parenting education, substance abuse programs, and has finally obtained suitable housing, we are nevertheless mindful of the fact that she has taken nearly three years to accomplish these service plan goals. Moreover, we deem significant the fact that Mother may have refused to participate in recommended counseling to work on parent-child bonding where Children have been out of her care for nearly their entire lives. ***See Adoption of C.J.P.***, 114 A.3d 1046, 1054 (Pa. Super. 2015) ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.").

We provide no conclusion on the final prong of subsection 2511(a)(8), as to do so would amount to an advisory opinion where we have concluded that the decrees should be reversed. Further, we recognize that CYS may petition to terminate Mother's rights under other 2511(a) subsections with clear and convincing evidence, especially if justified by the needs and welfare of Children.